UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


                          Plaintiff,

                                                    <u>DECISION AND ORDER</u>

                                                    05-CR-6161L


             v.


JOHN NICOLO,
CONSTANCE ROEDER,
CHARLES SCHWAB,
DAVID FINNMAN,


                          Defendants.
_____


        This is a criminal action against four defendants, John Nicolo, Constance Roeder, Charles

Schwab, and David Finnman, charging them with various offenses involving an alleged scheme to

defraud the Town of Greece, New York ("Greece"), Eastman Kodak Company ("Kodak"), and other

companies in the Western District of New York.  Although the alleged scheme involved numerous

acts taking place over a period of years, and cannot neatly be summarized in a sentence or two, in

general it involved the payment of kickbacks by Nicolo to Schwab, Finnman and other

coconspirators in return for the coconspirators' hiring Nicolo, or companies owned by Nicolo, to

perform appraisals of real property owned by Kodak and other entities, mostly within Greece.

A jury trial in this case is currently scheduled to begin on March 10, 2008.  On September 13, 2007, the Court heard oral argument on pretrial motions filed by Nicolo and Roeder.  Finnman's motion was argued on September 20, 2007, Schwab's motion was argued on October 19.  This Decision and Order constitutes my rulings on all defendants' motions.

## DISCUSSION

### I. Defendants' Motions to Dismiss the Honest Services Fraud Counts[1]

### A. Constitutional Challenges

Defendants Nicolo, Schwab and Finnman have moved to dismiss Counts 1-4, 7, 10-17, and 20-22, which charge that defendants acted together to defraud the taxpayers of Greece, Kodak, and other entities of their right to honest services, and to dismiss Counts 33-53, which charge Nicolo with money laundering offenses in connection with the fraud counts recited above.  All of these counts will be collectively referred to as the "honest services fraud" counts.

The statute under which defendants are charged in these counts, 18 U.S.C. § 1346, provides that "[f]or the purposes of th[e] chapter [of the United States Code that prohibits, *inter alia*, mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343], the term 'scheme or artifice to defraud'

---

[1]Although each defendant's motion papers do not discuss every one of the various grounds for defendants' challenges to these charges, each defendant charged in these counts has joined in the other defendants' motions, and adopted the other defendants' arguments, with respect to their motions to dismiss these counts.  *See* Nicolo's Mem. of Law (Dkt. #74-3) at 64; Finnman's Mem. of Law (Dkt. #76-2) at 52; Schwab's Mem. of Law (Dkt. #122) at 35.

includes a scheme or artifice to deprive another of the intangible right of honest services."[2]  Nicolo

contends that § 1346 is unconstitutional, for a number of reasons.

To a great extent, defendants' challenges to the statute are foreclosed by the Second Circuit's

decision in *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), *cert. denied*, 543 U.S. 809 (2004).

In *Rybicki*, the Court of Appeals, sitting *en banc*, held, *inter alia*, that § 1346 was not

unconstitutional on its face, nor was it unconstitutionally vague as applied to the facts of *Rybicki*,

in which the defendant attorneys were alleged to have used the mails and wires to induce certain

insurance adjusters, in return for payments and against the interests of the insurance companies that

employed them, secretly to expedite insurance claims in favor of the attorneys' clients, and that in

furtherance of this scheme, the insurance adjusters engaged in material omissions in the information

that they gave to the insurance companies.

In the case at bar, defendants recognize that the Second Circuit has already ruled, adversely

to them, on some of the arguments that they raise in support of their motions to dismiss the honest

services fraud counts.  *See* Nicolo's Mem. of Law (Dkt. #74-3) at 29; Schwab's Mem. of Law (Dkt.

#122) at 5.  Defendants also concede that "no court of appeals has definitively declared the 'honest

services' statute unconstitutional."  *Id.*  They state, however, that they are nevertheless "mount[ing]

constitutional challenges" to the statute ""[b]ecause the United States Supreme Court has yet to

---

[2]Some of the honest services fraud counts do not actually charge Nicolo with a violation
of § 1346; Count 1, for example, alleges only a violation of the general conspiracy statute, 18
U.S.C. § 371.  Other counts allege violations of statutes in addition to § 1346; Count 2, for
example, charges a violation of 18 U.S.C. §§ 1341, 1346 and 2.  All of the honest services fraud
counts, however, are premised on Nicolo's participation in a scheme to defraud the alleged
victims of their right to honest services, in violation of § 1346.

address the constitutionality of § 1346."  Nicolo's Mem. of Law at 30; Schwab's Mem. of Law at 5-6.

To the extent that the Second Circuit in *Rybicki* has already rejected defendants' arguments concerning the constitutionality of § 1346, then, defendants raise those arguments simply to preserve their rights should the Supreme Court overrule *Rybicki*.  Unless and until that happens, however, *Rybicki* remains the law in this circuit, and I deny defendants' motions to dismiss the honest services fraud counts on the grounds that § 1346 is facially "void for vagueness," *see Rybicki*, 354 F.3d at 129-32, 144.

I also find that § 1346 is not unconstitutionally infirm as applied to defendants in the case at bar.  The Court of Appeals in *Rybicki* stated that "when ... the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' *i.e.*, 'in light of the specific facts of the case at hand and not with regard to the statute's facial validity.'" 354 F.3d at 129 (quoting *United States v. Nadi*, 996 F.2d 548, 550 (2$^d$ Cir.), *cert. denied*, 510 U.S. 933 (1993)).  The court held that § 1346 was not invalid as applied in *Rybicki*, because the statute, "together with either section 1341 or section 1343, 'gives the person of ordinary intelligence a reasonable opportunity to know' that conduct of the type in which the defendants engaged with the specific intent to defraud ... deprived the [victim] insurance companies of the 'honest services' of their employees and is therefore prohibited by law."  *Id.* at 132 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)).

In the case at bar, defendants' vagueness challenges to § 1346 are couched largely in terms of the statute's facial invalidity.  Nicolo does raise one argument, however, concerning the alleged

vagueness of the statute as applied to him. Specifically, Nicolo asserts that while the indictment alleges that Nicolo participated in a scheme to defraud Kodak and the Greece taxpayers of their right to honest services, it fails to identify any fiduciary duty owed by Nicolo to those putative victims. The government responds that it is unnecessary to allege that Nicolo himself had a fiduciary duty to the victims, because Nicolo is alleged to have conspired with, and to have aided and abetted, individuals who *did* have fiduciary duties–which they breached–to their employers and to the public.

I agree with the government's position. A number of courts have held that fraud charges involving a breach of fiduciary duty may properly be brought against a nonfiduciary based on a conspiracy or aiding-and-abetting theory. *See*, *e.g.*, *United States v. Martin*, 228 F.3d 1, 18 (1st Cir. 2000) (evidence of nonfiduciary defendant's willing participation in codefendant's breach of fiduciary duty supported finding that nonfiduciary's participation in scheme to defraud fiduciary's employer of fiduciary's honest services was sufficient to maintain liability for aiding and abetting pursuant to 18 U.S.C. § 2); *United States v. Kenrick*, 221 F.3d 19, 32 n. 17 (1st Cir.) ("Even if [the nonfiduciary defendant] did not execute the scheme, there was sufficient evidence that he 'associated himself with the venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed' to find him guilty of aiding and abetting [the fiduciary's] fraud") (quoting *United States v. Colon-Munoz*, 192 F.3d 210, 223 (1st Cir. 1999), *cert. denied*, 529 U.S.1055 (2000)), *cert. denied*, 531 U.S. 561 (2000); *United States v. Paradies*, 98 F.3d 1266, 1282 (11th Cir. 1996) (affirming conviction of non-fiduciary defendants, who paid off city council member in exchange for political influence, of aiding and abetting violation of § 1346), *cert. denied*, 521 U.S. 1106 (1997); *United States v. Alkins*, 925 F.2d 541 (2d Cir. 1991) (affirming convictions of Department

of Motor Vehicles ("DMV") employees and a car dealership owner for mail fraud conspiracy, even

though car dealership owner, while closely involved with the DMV employee defendants who were

in a fiduciary relationship with the state, did not himself owe the state any similar duty); *United*

*States v. Mahaffy*, No. 05-CR-613, 2006 WL 2224518, at *17 (E.D.N.Y. Aug. 2, 2006) ("even

though the Watley defendants may not have had a duty to the Brokerage Firms or the firms' clients,

and thus might not have committed the substantive [securities fraud] offense directly, it is axiomatic

"that a defendant who does not directly commit a substantive offense may nevertheless be liable if

the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably

foreseeable to the defendant as a consequence of their criminal agreement") (citing *Cephas v. Nash*,

328 F.3d 98, 101 n. 3 (2$^{d}$ Cir. 2003)).

Nicolo also notes that in *United States v. Brown*, 459 F.3d 509 (5th Cir. 2006), *cert. denied*,

127 S.Ct. 2249 (2007), the Fifth Circuit stated that "[i]n order that not every breach of fiduciary duty

owed by an employee to an employer constitute an illegal fraud, [there must be] some detriment to

the employer" to support a conviction under § 1346. *Id.* at 519.  Nicolo argues that the indictment

here fails to allege any actual harm to Kodak, or that the services provided to Kodak pursuant to the

kickback scheme did not achieve Kodak's corporate objective of lowering its property tax

assessments.  Nicolo's Mem. of Law at 40 n. 44.

Nicolo's reliance on *Brown* is misplaced.  In *Rybicki*, the Second Circuit discussed the two

common types of honest services cases:  those involving bribes or kickbacks, and those involving

self-dealing.  In bribery or kickback cases, the court explained, "a defendant who has or seeks some

sort of business relationship or transaction with the victim secretly pays the victim's employee (or

causes such a payment to be made) in exchange for favored treatment."  354 F.3d at 139.  "In the

self-dealing cases, the defendant typically causes his or her employer to do business with a

corporation or other enterprise in which the defendant has a secret interest, undisclosed to the

employer."  *Id.* at 140.

The court went on to state that the two types of cases "are thus of the same general import

..., with this apparent difference:  In bribery or kickback cases, *the undisclosed bribery itself is*

*sufficient to make out the crime*, but in self-dealing cases, the existence of a conflict of interest alone

is not sufficient to do so.  ... In the self-dealing context, *though not in the bribery context*, the

defendant's behavior must thus cause, or at least be capable of causing, some detriment–perhaps

some economic or pecuniary detriment–to the employer."  *Id.* at 141 (emphases added).

*Brown* is not to the contrary.  In *Brown*, the Fifth Circuit held that "where an employer

intentionally aligns the interests of the employee with a specified corporate goal, where the employee

perceives his pursuit of that goal as mutually benefitting him and his employer, and where the

employee's conduct is consistent with that perception of the mutual interest, such conduct is beyond

the reach of the honest-services theory of fraud as it has hitherto been applied."  459 F.3d at 522.

Applying that principle to the facts before it, the court held that "the scheme as alleged [in which the

defendant Enron executives were accused of 'parking' the company's assets, and thereby temporarily

removing them from the company's balance sheet, in order to make Enron appear more profitable

than it really was] falls outside the scope of honest-services fraud."  In reaching that conclusion,

however, the court noted that

the private and personal benefit, i.e. increased personal bonuses, that allegedly diverged from
the corporate interest was itself a promise of the corporation.  According to the Government,

> Enron itself created an incentive structure tying employee compensation to the attainment of corporate earnings targets. In other words, this case presents a situation in which the employer itself created among its employees an understanding of its interest that, however benighted that understanding, was thought to be furthered by a scheme involving a fiduciary breach; in essence, all were driven by the concern that Enron would suffer absent the scheme. Given that the only personal benefit or incentive originated with Enron itself–*not from a third party as in the case of bribery or kickbacks*, nor from one's own business affairs outside the fiduciary relationship as in the case of self-dealing–Enron's legitimate interests were not so clearly distinguishable from the corporate goals communicated to the Defendants (via their compensation incentives) that the Defendants should have recognized, based on the nature of our past case law, that the "employee services" taken to achieve those corporate goals constituted a criminal breach of duty to Enron.

*Id.* (emphasis added).

The case at bar does involve alleged kickbacks. For example, Count 1 of the indictment alleges that in return for causing Nicolo to be hired to perform real property appraisal services for Kodak and another company, Global Crossing, Finnman (who worked for both companies at different times) "received money representing kickbacks" from Nicolo and Schwab. Dkt. #70 at 15. Counts 4 and 7 allege that unindicted coconspirator Mark Camarata, an accountant in Kodak's Corporate Tax Department, received similar kickbacks. *Id.* at 33, 37-38, 52, 54. Given those allegations, there is no requirement that the government allege any concrete detriment to Kodak. *Rybicki*, 354 F.3d at 141; *see also United States v. Kuznetsov*, No. 05 CR 916, 2007 WL 2020110, at *19 (S.D.N.Y. July 11, 2007) ("According to Yakovlev's own testimony, the secret monies he accepted were in the nature of bribes or kickbacks. The Government was thus not required to prove that Yakovlev had intended his conduct to pose a detriment to the [victim] United Nations").

Furthermore, the indictment *does* allege harm to Kodak and the other victims: the victims' payment of fees for work that was never actually performed. For example, Count 7 alleges that defendants "obtained money from Kodak, ITT Industries and IBM by causing Nicolo to be paid

- 8 -

unwarranted and unnecessary fees with respect to certain contracts Nicolo had with these companies." Dkt. #70 at 53. Count 7 further alleges that "[d]espite his hiring [by Camarata to perform certain work for Kodak], Nicolo provided essentially no services to Kodak in connection with the reduction in the real property tax assessment for Kodak Park Greece." *Id.* at 56.

In addition, if in fact Nicolo was paying kickbacks to Camarata in return for Camarata engineering the hiring of Nicolo and Nicolo's companies by Kodak, that in itself suggests that Kodak was paying inflated prices for Nicolo's services. In *United States v. Lamoreaux*, 422 F.3d 750 (8th Cir. 2005), for example, the defendant was convicted of mail fraud under 18 U.S.C. § 1341. The evidence at trial showed that the defendant, who had been the president of a closely held corporation ("NuCare"), received kickbacks from another company ("Albers Medical") in exchange for his negotiation of certain agreements between NuCare and Albers Medical.

On appeal, the defendant argued that the evidence was insufficient to support his conviction because the government had failed to prove that the defendant intended to harm NuCare, or that his scheme actually harmed NuCare. Specifically, he asserted that the government had failed to prove intent to defraud because there was no proof that NuCare could have negotiated a better contract with Albers Medical absent the secret kickbacks. Rejecting that argument, the Eighth Circuit stated that "proof that a customer made substantial and secret kickbacks to a corporate fiduciary is sufficient to support a finding of intent to harm because actual harm may reasonably be inferred from the fact that the customer paid the fiduciary amounts to which the corporation was entitled."

In support of its holding, the *Lamoreaux* court cited *United States v. George*, 477 F.2d 508 (7th Cir. 1973), in which the defendant, a purchasing agent for the victim corporation ("Zenith"),

received kickbacks from another company in exchange for Zenith's business.  Rejecting the defendant's contention that Zenith was not harmed because the prices that the defendant negotiated were within Zenith's normal profit margin, the Seventh Circuit stated that the defendant's "undisclosed receipt of the kickbacks by itself warrants a finding that he intended to defraud Zenith of his honest and loyal services.  His employment duty was to negotiate the best possible deal for Zenith, or at least to apprise Zenith that [the other company] would be satisfied with a lesser profit margin.  He is presumed to know that he could not personally profit by any decrease in price he could negotiate ... and that any such decrease should be made available to Zenith."  *Id.* at 513-14 (footnote omitted).

The same reasoning applies here.  As the court put it in *George*, "[i]t is preposterous to claim" that Kodak would not have considered the kickbacks alleged here to have been material both to its decision to hire Nicolo and his companies, and to the price Kodak agreed to pay for his purported services.  *Id.* at 513.  *See also United States v. Richman*, 944 F.2d 323, 330 (7th Cir. 1991) ("inducement for a company to part with money based upon an implicit false premise violates the mail fraud statute when any portion of the money the company is induced to pay is fraudulently given to the company's own employee without the company's knowledge and/or consent").

In addition, although Kodak may have had a general desire to get its tax assessments reduced, that does not mean that it endorsed, or would have endorsed had it know of them, the particular means by which that was achieved in this case.  Thus, in *United States v. Reyes*, No. CR 06-00556, 2007 WL 831808 (N.D.Cal. Mar. 16, 2007), in which the defendants were alleged to have engaged

in a scheme involving backdating stock options for their own personal gain, the court, denying a

motion to dismiss the honest services fraud charges, stated that

> [t]o say that [the corporate victim] recognized stock options as a legitimate tool for recruiting
> talent is not to suggest that the company necessarily recognized any use of that tool by
> [defendants] Reyes and Jensen as legitimate.  Without an allegation that the company in fact
> condoned backdating, as opposed to merely the use of stock options, the indictment cannot
> be construed as affirmatively recognizing that Defendants were pursuing their alleged
> backdating scheme in the company's best interests.  In fact, the only fair construction of the
> indictment is that the company did not sanction the Defendants' alleged backdating scheme
> and that Defendants implemented the scheme for their own personal gain.  After all, the
> indictment explicitly alleges that Reyes and Jensen concealed their scheme from the
> company and its directors. ... Thus, although the indictment recognizes the possibility that
> stock options may be employed in a legitimate fashion to promote a company's interests, it
> does not necessarily follow, as Defendants contend, that the indictment also therefore
> recognizes their alleged backdated scheme as furthering legitimate corporate purposes.

2007 WL 831808, at *5.[3]


## B. Duplicity

In addition to joining in Nicolo's and Schwab's challenges to the honest services fraud

counts, *see* n. 1, *supra*, Finnman also argues that Count 1 of the indictment, which charges Finnman,

Nicolo and Schwab with a conspiracy to commit honest services fraud, should be dismissed as

duplicitous.  The basis for this argument is Finnman's contention that Count 1 charges two separate

---

[3]Although Nicolo makes this argument with respect to the honest services fraud counts
generally, his argument also fails to take into account that Kodak was not the only alleged victim.
Several counts of the indictment allege that Nicolo and the other defendants engaged in a scheme
to defraud the taxpayers of Greece of *their* right to the honest services of defendant Schwab.
Such a scheme has been held to violate the mail fraud statutes, even prior to the enactment of §
1346.  *See United States v. Ginsburg*, 909 F.2d 982, 986-91 (7th Cir. 1990) (indictment
sufficiently alleged, and evidence at trial supported jury's finding, that defendant attorneys
engaged in scheme to defraud county of tangible right to revenues by fraudulently reducing tax
assessments of defendants' clients by means of bribery of members of county board of tax
appeals).

and distinct conspiracies in a single count.  Although Finnman's arguments in this regard are not always entirely clear, he appears to contend that Count 1 impermissibly charges both a conspiracy to defraud Kodak and a conspiracy to defraud Global Crossing.

To the extent that Finnman asserts that Count 1 should be dismissed on the ground that it charges multiple conspiracies, his motion is premature.  "It is well-settled law that '[w]hether the evidence in a case establishes single or multiple conspiracies is a question of fact to be resolved by a properly instructed jury.'"  *United States v. Torres*, No. S2 94 Cr. 466, 1995 WL 261531, at *2 (S.D.N.Y. May 4, 1995) (quoting *United States v. Friedman*, 854 F.2d 535, 561 (2[d] Cir. 1988), *cert. denied*, 490 U.S. 1004 (1989)).  *See also United States v. Gall*, No. 3:95CR98, 1996 WL 684404, at *2 (D.Conn. Aug. 12, 1996) ("The Second Circuit has repeatedly stated that the question of whether the government has established the existence of the charged conspiracy and each defendant's membership in it or, instead, has proven several distinct conspiracies, is one of fact for a properly instructed jury") (citing cases); *accord United States v. W.R. Grace*, 429 F.Supp.2d 1207, 1225 (D.Mont. 2006); *United States v. Melendez*, No. 03-80598, 2004 WL 162937, at *4 (E.D.Mich. Jan. 20, 2004); *United States v. Cisneros*, 26 F.Supp.2d 24, 52 (D.D.C. 1998).

In addition, Count 1 is not duplicitous on its face.  The Second Circuit has explained that "[a]n indictment is impermissibly duplicitous where:  1) it combines two or more distinct crimes into one count in contravention of Fed.R.Crim.P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby."  *United States v. Sturdivant*, 244 F.3d 71, 75 (2[d] Cir. 2001).

The fact that a single count charges several acts does not necessarily render it duplicitous, however.  "To the contrary, [the Second Circuit] has long held that 'acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme.'"  *United States v. Olmeda*, 461 F.3d 271, 281 (2$^d$ Cir. 2006) (quoting *United States v. Tutino*, 883 F.2d 1125, 1141 (2$^d$ Cir. 1989)).  *See also United States v. Salameh*, 152 F.3d 88, 148 (2$^d$ Cir. 1998) (stating that defendant was properly charged "with membership in a single conspiracy with multiple criminal objectives"); *United States v. Coffey*, 361 F.Supp.2d 102, 110 (E.D.N.Y. 2005) ("A charge of conspiracy to commit several crimes in one count is not duplicitous because the crime is conspiracy which is one crime regardless of the diversity of its objects") (citing *Frohwerk v. United States*, 249 U.S. 204, 210 (1919)).

With respect to conspiracy charges, the Second Circuit has stated that

> [a] conspiracy indictment presents "unique issues" in the duplicity analysis because "a single agreement may encompass multiple illegal objects."  In this Circuit "it is well established that [t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for [t]he conspiracy is the crime and that is one, however diverse its objects."

*United States v. Aracri*, 968 F.2d 1512, 1518 (2$^d$ Cir. 1992) (quoting *United States v. Murray*, 618 F.2d 892, 896 (2$^d$ Cir. 1980) (additional internal quotation marks omitted).  *See also Braverman v. United States*, 317 U.S. 49, 53 (1942) ("Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes.  The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one"), *cited in Aracri*, 968 F.2d at 1518.

Applying these principles, the Second Circuit in *Aracri* held that the indictment, which charged the defendants with conspiring to defraud the federal government out of gasoline excise taxes, was not duplicitous simply because it alleged that the defendants engaged in several different types of fraudulent acts in furtherance of the scheme.  Noting that it had previously declined to adopt a rule "that any acts capable of being charged as separate offenses must be alleged in separate counts," *id.* (quoting *United States v. Margiotta*, 646 F.2d 729, 733 (1981)), the court concluded that the indictment before it "charged a single conspiracy to defraud the United States and listed various means of furthering that conspiracy."  *Id.*

Here, Finnman's argument is, in essence, that because Count 1 alleges that there were two victims of the alleged conspiracy, Kodak and Global Crossing, Count 1 therefore alleges two conspiracies:  a conspiracy to defraud Kodak and a conspiracy to defraud Global Crossing.  As the case law makes clear, however, the fact that an indictment alleges multiple victims does not necessarily mean that it alleges multiple conspiracies.

In *United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989), for example, the indictment charged the defendant with devising a scheme to defraud both a class of taxpayers, who were fraudulently induced to invest in illegal tax shelters, and the United States Treasury, which was deprived of tax revenue as a result of the tax shelters.  The Ninth Circuit rejected the defendant's contention that certain counts were duplicitous because they alleged two different schemes:  the first to defraud taxpayers, and the second to defraud the government.  In so doing, the court said that it had

> previously rejected Bryan's argument that a single count alleging that the defendant schemed to defraud a variety of victims is necessarily duplicitous.  In *United States v. Mastelotto*, 717 F.2d 1238 (9th Cir. 1983), we held that "'the defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme.'"

- 14 -

*Id.* at 1245, quoting *Owens v. United States*, 221 F.2d 351, 354 (5th Cir. 1955).  As long as "the set of fraudulent transactions alleged in a count is within the conceivable contemplation of a greedy mind, no duplicity has occurred."  *Id.* at 1244.  Thus, that the scheme alleged in Counts 1 through 20 was alleged to have defrauded two sets of victims does not require a finding that two separate "schemes" existed.  *Id.* at 1245.

*Bryan*, 868 F.2d at 1037-38.  *See also United States v. Morse*, 785 F.2d 771, 774 (9th Cir. 1986) (rejecting a duplicity challenge to an indictment alleging that four separate tax shelter ventures involving different victims comprised a single "scheme to defraud"); *United States v. Zeidman*, 540 F.2d 314, 317 (7th Cir. 1976) (single count of mail fraud not duplicitous even though allegations embraced two classes of victims and could have been charged in separate counts; "The frauds were performed by the same parties and have a sufficiently close nexus with one another that they are fairly characterized as one scheme"); *United States v. Albunio*, No. CR-91-0403, 1992 WL 281037 at *1, 4 (E.D.N.Y. Sept. 9, 1992) (rejecting defendant's argument that a single count charging "multiple acts of extortion at various (unspecified) locations at various (unspecified) times over a three year period from various (unspecified) victims" was duplicitous, and holding that the indictment charged a single, continuous scheme of extortion); *United States v. Desantis*, 802 F.Supp. 794, 801 (E.D.N.Y. 1992) (counts which named one individual as extortion victim and counts which named another individual as extortion victim were of the same character and parts of common scheme and, thus, were properly joined in same indictment, since individuals were alleged victims of same loansharking extortion scheme).

These principles apply fully here.  Count 1 alleges, permissibly, that defendants engaged in a "single continuing scheme" defrauding both Kodak and Global Crossing.  *Tutino*, 883 F.2d at 1141.  That Kodak and Global Crossing may have been victimized at different times (due in part to

Finnman's leaving Kodak to work for Global Crossing) does not mean otherwise. It is hardly unusual for a conspiracy to evolve over time, in response to changes in circumstances. That does not mean that the conspiracy has terminated or that a new, distinct conspiracy has begun. *Cf. United States v. Armstrong*, Cr. No. 05-130, 2007 WL 809509, at *6 (E.D.La. Mar. 14, 2007) (evidence at trial of owner-operator of weight loss clinics on charge of conspiring with physicians to illegally dispense controlled substances to clients supported existence of single conspiracy lasting from 1998 to 2005, notwithstanding fact that no distributions occurred during period from one physician's resignation in October 2000 to another's hiring in 2002; "simply because there was a gap in time when a physician registrant was not a participant and [defendant] and her co-conspirators could not commit a violation ... without a physician or other registrant's 'participation' d[id] not automatically terminate the conspiracy").

In any event, even "[d]uplicitous pleading ... is not presumptively invalid." *Olmeda*, 461 F.3d at 281. Duplicitous pleading is not impermissible unless it prejudices the defendant, *Sturdivant*, 244 F.3d at 75 n. 3. In that regard, the Second Circuit has declined to adopt a rule absolutely proscribing duplicitous pleading, since such a rule could inure to defendants' detriment by "requir[ing] exposure to cumulative punishments." *Margiotta*, 646 F.2d at 733.

In addition, even if an indictment is duplicitous, and even if that duplicity presents some risk of prejudice to the defendant, that risk can often be avoided through jury instructions making clear to the jurors that they must unanimously agree on the particular conduct underlying the conviction. *Sturdivant*, 244 F.3d at 79; *see, e.g.*, *United States v. Helmsley*, 941 F.2d 71, 91 (2[d] Cir. 1991) ("any possibility of a duplicitous verdict was removed by Judge Walker's careful charge regarding

unanimity on Count 1"); *Zeidman*, 540 F.2d at 317-18 (stating, with respect to defendants' argument that because indictment charged them in single count with defrauding two classes of victims, they could not be certain which victims the jury had found them guilty of defrauding, that defendants could not claim prejudice, since the "trial judge clearly instructed the jury that they must not return a guilty verdict unless they all agreed that the defendants had devised a scheme to defraud at least the creditor or the debtor," and that "[i]n view of the substantial evidence showing that both classes were victims, [court of appeals would] not presume that the jury disregarded this instruction"); *W.R. Grace*, 429 F.Supp.2d at 1225 (D.Mont. 2006) ("If the proof at trial shows that the conduct charged in Count I does in fact constitute two distinct conspiracies, steps can be taken to protect the Defendants from the risk of a non-unanimous verdict," such as "curative instructions to the jury, special interrogatories to insure unanimity, or the dismissal of all or part of the offending count") (footnote omitted).

## II. Bill of Particulars

### A. General Principles

Defendants request that the Court order the government to produce a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure.  Defendants seek a wide range of particulars concerning the details of the alleged appraisal scheme, including the names and addresses of all unnamed coconspirators and aiders and abettors, the dates, times, places and other specifics of each act alleged to have been committed in furtherance of the scheme to defraud, and other factual matters.

"An indictment that fulfills the requirements of Federal Rule of Criminal Procedure 7(c)(1) but is nonetheless 'insufficient to permit the preparation of an adequate defense' may be supplemented with a bill of particulars." *United States v. Rigas*, 490 F.3d 208, 237 (2[d] Cir. 2007) (quoting *United States v. DiCesare*, 765 F.2d 890, 897 (9th Cir. 1985)); *see also United States v. Bortnovsky*, 820 F.2d 572, 574 (2[d] Cir. 1987) (per curiam).   A bill of particulars "enabl[es a] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Davidoff*, 845 F.2d 1151, 1154 (2[d] Cir. 1988) (quoting *Bortnovsky*, 820 F.2d at 574).   *See also United States v. Walsh*, 194 F.3d 37, 47 (2[d] Cir. 1999) (purpose of a bill of particulars is to "advise the defendant of the specific acts of which he is accused") (internal quotation marks omitted).

Particulars need not be provided, then, unless they are necessary to apprise a defendant of the charges against him so as to enable him to prepare his defense and avoid unfair surprise at trial.   *See Wong Tai v. United States*, 273 U.S. 77, 82 (1927); *United States v. Torres*, 901 F.2d 205, 234 (2[d] Cir.), *cert. denied*, 498 U.S. 906 (1990).

Moreover, the burden is on the defendant to show that non-disclosure of the requested particulars will lead to prejudicial surprise at trial or will adversely affect his rights.   *See Torres*, 901 F.2d at 234.   The decision to grant or deny a bill of particulars is committed to the sound discretion of the trial court.   *Id.*; *Bortnovsky*, 820 F.2d at 574.   The court may "deny a bill of particulars 'if the information sought by defendant is provided in the indictment or in some acceptable alternate form.'"   *United States v. Barnes*, 158 F.3d 662, 665 (2[d] Cir. 1998) (quoting *Bortnovsky*, 820 F.2d at 574).

It is well settled that the Government is not required to particularize all of its evidence. *Davidoff*, 845 F.2d at 1154.  Nor is the Government obligated to "disclos[e] the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of [its] evidence or legal theories." *United States v. Mitlof*, 165 F.Supp.2d 558, 569 (S.D.N.Y. 2001).  "A bill of particulars is not an investigative tool, or a tool of discovery, but rather 'is meant to apprise the defendant of the essential facts of a crime ... .'" *United States v. Ordaz-Gallardo*, ___ F.Supp.2d ___, 2007 WL 3050976, at *5 (S.D.N.Y. Oct. 17, 2007) (quoting *United States v. Perez*, 940 F.Supp. 540, 550 (S.D.N.Y. 1996)).  Accordingly, "'[a] bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *Torres*, 901 F.2d at 234 (quoting *United States v. Feola*, 651 F.Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2[d] Cir.), *cert. denied*, 493 U.S. 834 (1989)).


**B. Application to this Case**

Applying these principles to the case at bar, I conclude that no bill of particulars is warranted. The 179-page third superseding indictment (Dkt. #70) sets forth the alleged conspiracy in extensive detail, setting forth the exact dates and amounts of alleged kickback payments, the dates and subject matter of relevant mailings and wire transmissions, the dates on which appraisal contracts were entered into and the location of the subject properties, and other information concerning defendants' alleged acts.  This indictment is one of the most detailed, thorough indictments that I have seen. The indictment thus clearly informs defendants of what they are charged with, in sufficient detail to

allow them to prepare a defense. *See United States v. Zoernack*, No. 04 CR. 868, 2005 WL 1837962, at *4 (S.D.N.Y. Aug. 2, 2005) (stating that "the Indictment provides specific information for each allegedly fraudulent transaction, including the date, the amount in question, and the banks to and from which the money was transferred," and denying defendant's request to "compel the Government to identify any and all false and fraudulent statements" made as part of the alleged criminal scheme).

In addition, defense counsel admits that the government has turned over roughly 100,000 pages of discovery material in this case, which further amplify the government's allegations. *See* Transcript of Sept. 13, 2007 Oral Argument (Dkt. #128) at 16, 45, 48. *See also Zoernack*, 2005 WL 1837962, at *4 (noting that "[t]he Government also proffers that it has provided defense with 7,000 pages of discovery related to Zoernack's fraudulent scheme").

Although defendants correctly note that "[t]he Government d[oes] not fulfill its obligation merely by providing mountains of documents to defense counsel who [a]re left unguided as to which documents" are relevant or will be offered at trial, *United States v. Bortnovsky*, 820 F.2d 572, 575 (2$^d$ Cir. 1987), the mere fact that voluminous discovery has been provided is not enough by itself to require a bill of particulars. *See United States v. Ferguson*, 478 F.Supp.2d 220, 227 (D.Conn. 2007) ("Just as the government cannot merely produce unlimited documents in lieu of providing sufficient detail as to the charges, the defendants cannot 'use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government when the Indictment, discovery, and other information provided by the government adequately notify the

Defendants of the charges against them'") (quoting *United States v. Rigas*, 258 F.Supp.2d 299, 305 (S.D.N.Y. 2003)).

As mentioned, the indictment is hardly a "bare bones" indictment.  The indictment contains a wealth of detail, and is anything but "bare bones"; it describes with specificity the numerous particular transactions that form the basis of the charges against defendants.  *Cf. United States v. Luna*, No. 3:05cr58, 2006 WL 1668006, at *2 (D.Conn. May 17, 2006) (bill of particulars was warranted where indictment set forth "bare bones" narcotics conspiracy charge spanning seven years, and defendant's trial attorney entered case less than a week before start of evidence).  "Where ... Defendants have been given significant details about the crimes alleged, it cannot be said that 'the charges of the indictment are so general that they do not advise the Defendants of the specific acts which [they are] accused.'"  *United States v. Russo*, 483 F.Supp.2d 301, 311 (S.D.N.Y.  2007) (quoting *Torres*, 901 F.2d at 234).  *See also United States v. Torres*, No. 05-CR-838, 2006 WL 1982750, at *5 (E.D.N.Y. July 13, 2006) (denying bill of particulars where "the indictment provide[d] sufficient evidence of the crimes alleged to have been committed," and "[t]he Defendant [wa]s aware of what he [wa]s being charged with, when the alleged crime took place, and the circumstances around that crime"); *United States v. Mahaffy*, 446 F.Supp.2d 115, 120 (E.D.N.Y. 2006) (finding no justification for bill of particulars where, *inter alia*, "[t]he Indictment ... specifie[d] ... the date, volume, price, and source of the allegedly unlawful transactions at issue");

In addition, defense counsel will have had many months (at least six to nine months) to review the documents turned over to them by the start of the trial in March 2008.

This is hardly a situation, then, in which defendants, faced with an indictment that does little more than track the language of the statute, have had an undifferentiated mass of documents dumped on them at the eleventh hour, or where "the defendant[s] remain[] in the dark about the specific acts of which [they are] accused." *United States v. Urso*, 369 F.Supp.2d 254, 271 (E.D.N.Y. 2005). *See United States v. Columbo*, No. 04 CR. 273, 2006 WL 2012511, at *6 (S.D.N.Y. July 18, 2006) ("While defendants claim that the quantity of audio tapes and documents produced in this case is voluminous and overwhelming, we note that they will have had more than a year to review discovery prior to trial") (footnote omitted); *United States v. Harding*, 273 F.Supp.2d 411, 430 (S.D.N.Y. 2003) (denying bill of particulars where the indictment "describe[d] in sufficient detail the nature of and acts alleged to have been committed in furtherance of the conspiracy charged in count one to permit [defendant] to prepare his defense, avoid unfair surprise and enable him to dispel any concern regarding his exposure to future prosecution for the same offense," and where the government had turned over more than 12,000 pages of discovery materials).

Many of the particulars sought by defendants are also not of the type to which defendants are entitled. "As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars. More specifically, details regarding the date on which the conspiracy was formed, or when each participant entered into the conspiracy need not be revealed before trial." *Id.* at 272-73 (citations omitted). *See also United States v. Waker*, 463 F.Supp.2d 348, 358-59 (W.D.N.Y. 2006) ("Defendant's requests seek the Government's theory of prosecution and specific evidence, and are therefore beyond the scope of Rule 7(f)"). Likewise, the names of unindicted coconspirators need not be provided. *See Mahaffy*, 446 F.Supp.2d at 120 ("[t]he appellate

case law is clear that the refusal of a district court to direct the filing of a bill of particulars as to the names of unindicted co-conspirators is not an abuse of discretion") (quoting *United States v. Gotti*, 784 F.Supp. 1017, 1018 (E.D.N.Y. 1992) (citing *Torres*, 901 F.2d at 233-34)).


## III. Nicolo's Motion to Change Venue

### A. Pretrial Publicity

Defendant Nicolo has moved, pursuant to Rule 21 of the Federal Rules of Criminal Procedure, for an order transferring venue of this case to the Southern District of Florida, or in the alternative to the Southern District of New York. The primary basis for Nicolo's motion is his contention that he cannot receive a fair trial in this district, for a number of reasons.

Rule 21(a) provides that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Nicolo contends that this transfer is warranted under this rule on the ground that it is impossible to obtain a fair and impartial jury here, for three reasons. First, he contends that inflammatory and prejudicial pretrial publicity about him and this case has permeated the jury pool in this area. Second, he asserts that taxpayers in Greece, Rochester, and all of Monroe County are, according to the indictment, "victims" of the alleged scheme, in that they lost the benefit of the taxes that Kodak and other companies would have paid to those municipalities absent the alleged unlawful scheme.[4] Hence, he argues, those taxpayers are likely to be prejudiced against defendants. Third,

---

[4]The indictment alleges that "Greece has taxpayers who pay real property taxes to Greece (continued...)

Nicolo contends that nearly all prospective jurors in this area will have some connection to Kodak, making it impossible for them to remain impartial.

I find these assertions to be without merit.  Defendant has fallen far short of the showing required to justify a transfer under Rule 21(a), at this stage of the proceedings.

"Substantial publicity alone is not enough to require a change of venue." *United States v. Stevens*, 83 F.3d 60, 66 (2$^d$ Cir. 1996) (citing *Dobbert v. Florida*, 432 U.S. 282, 303 (1977)).  Rather, "[i]n order to prevail on a motion under Rule 21(a), the defendant must show 'a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial.'"  *United States v. Maldonado-Rivera*, 922 F.2d 934, 966-67 (2$^d$ Cir. 1990) (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966)), *cert. denied*, 501 U.S. 1211 (1991).

Pretrial publicity is not a unique circumstance in federal criminal matters.  It is rather common in so-called "high profile" cases for there to be publicity.  A change of venue though is not warrant just because of some publicity.

In assessing a Rule 21(a) transfer motion, "the district court may take into account, *inter alia*, the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially.  The ultimate determination of whether unfavorable publicity

---

[4](...continued)
... and the County of Monroe, New York."  Dkt. #70 ¶ 7.  Some of the properties involved were also located in Rochester.  Dkt. #70 ¶ 17.

renders a fair trial unlikely is committed to the district court's discretion ... ."  *Maldonado-Rivera*, 922 F.2d at 967.

In making that assessment, the Court must bear in mind that "in the era of modern communications, it is nearly impossible to find a juror who has not been exposed to *some* measure of information regarding a highly publicized case ... ."  *Knapp v. Leonardo*, 46 F.3d 170, 176 (2[d] Cir.) (emphasis added), *cert. denied*, 515 U.S. 1136 (1995).  Transfer is not warranted, however, simply because jurors may have some preexisting knowledge of the facts of a case, or even because they may have formed an opinion about the case.  "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.* (citing *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).  "In other words, the Constitution does not require ignorant jurors, only impartial ones."  *Id.* (citing *Murphy v. Florida*, 421 U.S. 794, 800 (1975)).

As this case law indicates, whether a change of venue is warranted due to prejudicial pretrial publicity depends to a great extent on the actual jury pool and the difficulty at trial of selecting an impartial jury.  Courts have therefore held that a motion for change of venue based on pretrial publicity is usually premature prior to *voir dire*.  *See*, *e.g.*, *United States v. Ayala-Martinez*, 24 F.Supp.2d 165, 168 (D.P.R. 1998) ("since the jury selection process has not yet commenced, ... plaintiff cannot establish [that jurors had formed fixed opinions about the case].  Thus, ... any claim by defendant as to actual prejudice is premature and illusory"); *United States v. Eskridge*, 818

F.Supp. 259, 263 (E.D.Wi. 1993) ("Since *voir dire* examination is the preferable time for determination of whether pretrial publicity necessitates a change of venue, defendant['s] motion is premature and will be denied without prejudice").  Nicolo's motion for a change of venue based on pretrial publicity is therefore denied without prejudice.

For the same reason, I also deny Nicolo's motion insofar as it is based on the presence of taxpayer "victims" in the jury pool, and on jurors' likely connections with Kodak.  In that regard, I note that courts have held that in assessing a motion for a change of venue under Rule 21(a), the size of the population and geographic area from which the jury pool is drawn is a relevant factor.  *See*, *e.g.*, *United States v. Lentz*, 352 F.Supp.2d 718, 724 (E.D.Va. 2005) (noting that "the jurors in this division are drawn from a population of more than two million people dispersed across Northern Virginia ... .  Thus, it is unlikely that unbiased jurors cannot be found in this division given its size and breadth").

The Rochester Division of the Western District of New York comprises nine counties with a population of over 1.2 million people spread out over 5329 square miles.  *See* United States Census Bureau State & County QuickFacts, *available at* http://quickfacts.census.gov/qfd/states/36000.html.  Although the events giving rise to this case have received some publicity in the Rochester area, defendant has not shown that the publicity has been so widespread throughout the district that it will likely be difficult to select an impartial jury.  Many potential jurors live far from Rochester, the northernmost city in the District.

Likewise, even assuming *arguendo* that the presence of Monroe County taxpayers in the jury pool could make it more difficult to select an impartial jury, *but see Los Angeles Mem. Coliseum*

*Comm'n v. National Football League*, 89 F.R.D. 497, 510-12 (C.D.Cal. 1981) (rejecting defendant's argument that transfer of litigation concerning proposed relocation of Oakland Raiders to Los Angeles was necessary because Los Angeles taxpayers would have a financial interest in the outcome of the case), the size of the Rochester Division of this district should mitigate any such difficulties. The same reasoning applies to Nicolo's argument concerning local jurors' connections with Kodak.[5]


**B. Appropriate Venue**

Nicolo also contends that transfer to the Southern District of Florida is proper because material events underlying the charged offenses occurred there. That venue might be *proper* in Florida, however, does not mean that it is required, or that venue in this district is *im*proper. It is well established that a single crime may be committed in more than one district, and that in such circumstances, "the whole may be tried where any part can be proved to have been done." *United States v. Rowe*, 414 F.3d 271, 278 (2[d] Cir. 2005) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)) (internal quotation marks omitted). *See also United States v. Reed*, 773 F.2d 477, 480 (2[d] Cir. 1985) ("where the acts constituting the crime and the nature of the crime charged

---

[5]Even if the jury in this action were to be drawn entirely from the immediate Rochester area, it is far from certain that a substantial portion of the jury pool would be "tainted" by any affection for Kodak. While defendant cites a January 30, 2006 *Rochester Democrat and Chronicle* newspaper article indicating that Kodak was the area's largest employer for many years, and remains the second largest, the newspaper also reported that day that the number of people employed by Kodak in Monroe County had shrunk from 34,000 to 16,300 over the previous ten years, and that "the company is not done with its massive restructuring ... ." *See* Matthew Daneman, *UR poised to become area's top employer*, Rochester Democrat and Chronicle, Jan. 30, 2006, *available at* www.lexis.com.

implicate more than one location, the [C]onstitution does not command a single exclusive venue"). *See also* Fed. R. Cr. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed").

"The law of this Circuit is clear that the Government's burden is satisfied with regard to pleading venue by alleging that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information."  *United States v. Bronson*, No. 05-CR-714, 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007); *see, e.g.*, *United States v. Bellomo*, 263 F.Supp.2d 561, 579 (E.D.N.Y. 2003) (indictment alleging that offenses occurred "'within the Eastern District of New York and elsewhere,' suffices to sustain it against this pretrial attack on venue"); *United States v. Szur*, 97-CR-108, 1998 WL 132942, at *9 (S.D.N.Y. Mar. 20, 1998) ("on its face, the Indictment alleges that the offense occurred 'in the Southern District of New York and elsewhere,' which is sufficient to resist a motion to dismiss").

In the case at bar, the indictment charges throughout that the alleged offenses were committed in the Western District of New York.  *See, e.g.*, Dkt. #70 at 14, 28, 30, 32, 46.  The indictment also alleges specific acts that defendants engaged in within this district.  *See, e.g.*, *id.* at 18, 29, 31, 34, 44, 49.  That is sufficient at this stage.  *Bronson*, 2007 WL 2455138, at *4 ("The Superseding Indictment alleges facts sufficient to support venue because it alleges that the criminal activity occurred 'within the Eastern District of New York and elsewhere'"); *see also United States v. Stein*, 429 F.Supp.2d 633, 643 (S.D.N.Y.2006) ("as long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied").

If the proof at trial fails to support venue in this district, defendant may move for a judgment of acquittal at the close of the government's case. *Bronson*, 2007 WL 2455138, at *4; *see also United States v. Lanza*, No. 3:03cr00025, 2006 WL 344955, at *1 (W.D.Va. Feb. 10, 2006) ("Where the indictment properly alleges venue, ... it would be premature for a district court to dismiss for improper venue. Under such circumstances, the defendant may await the government's case and move for acquittal if the government has failed to properly prove venue at trial") (citation omitted); *United States v. Ayeki*, 289 F.Supp.2d 183, 188 (D.Conn. 2003) (stating that "[s]ince the indictment, on its face, properly alleges venue in the District of Connecticut, there is no basis at this stage for moving for dismissal because of improper venue," but that "[i]f the government has failed to meet its burden of establishing venue at trial, Ayeki may move for a judgment of acquittal under Fed. R. Crim. P. 29 at the conclusion of the government's case"); *United States v. Korolkov*, 870 F.Supp. 60, 63-64 (S.D.N.Y. 1994) (where indictment alleges venue, objection to venue raises factual issue to be resolved at trial).

In addition, Nicolo's conclusory assertion that considerations of convenience favor a transfer are also without merit. *See Capital One Financial Corp. v. Drive Financial Services, L.P.*, 434 F.Supp.2d 367, 376 (E.D.Va. 2006) ("Defendants' conclusory statement that 'the Northern District of Texas is more convenient' for Defendants is insufficient for the Court to transfer venue"); *International Truck and Engine Corp. v. Quintana*, 259 F.Supp.2d 553, 558 (N.D.Tex. 2003) (conclusory statements regarding the convenience of witnesses are insufficient to support a motion to transfer); *Wishnoff v. Bentsen*, No. 93-CV-0017, 1993 WL 266559, at *2 (W.D.N.Y. July 8, 1993)

- 29 -

("to establish [the propriety of a transfer], the defendant must do more than merely make conclusory statements that another district is more convenient for witnesses").

## IV. Motions to Sever

## A. Roeder

Defendant Roeder moves for an order severing the charges against her from those against her codefendants, and to transfer venue of the charges against her to the Southern District of Florida. With respect to the motion to sever, Roeder contends that the counts against her, which all involve alleged tax fraud, are not properly joined with the other counts under Rule 8 of the Federal Rules of Criminal Procedure.

Rule 8(a), dealing with joinder of offenses, provides that "[t]he indictment ... may charge a defendant in separate counts with 2 or more offenses if the offenses charged ... are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Rule 8(b), dealing with joinder of defendants, provides that "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Subsection (b) further provides that "[t]he defendants may be charged in one or more counts together or separately" and that "[a]ll defendants need not be charged in each count."[6]

---

[6]The government, citing *United States v. Turoff*, 853 F.2d 1037 (2[d] Cir. 1988), contends that because this is a multiple-defendant case, Roeder's motion should be considered only under Rule 8(b), not under Rule 8(a). In *United States v. Shellef*, ___ F.3d ___, 2007 WL 3286908 (2[d] (continued...)

"Tax counts may be joined with non-tax counts where it is shown that the tax offenses arose directly from the other offenses charged." *United States v. Turoff*, 853 F.2d 1037, 1043 (2ᵈ Cir. 1988). "The most direct link possible between non-tax crimes and tax fraud is that funds derived from non-tax violations either are or produce the unreported income." *Id. See also United States v. Stein*, 428 F.Supp.2d 138, 143 (S.D.N.Y. 2006) ("The Second Circuit has made clear that tax evasion counts are joined properly where ... the defendant evaded taxes on funds received from other illegal activities charged in the indictment") (citing *Turoff*, 853 F.2d at 1043).

In the case at bar, Count 57, the tax conspiracy count against Roeder and Nicolo, alleges that from 1997 to 2005, defendants conspired to defraud the United States in connection with the Internal Revenue Service's collection of taxes. Specifically, Count 57 alleges, *inter alia*, that to reduce the net profits reported by Nicolo's various appraisal businesses–the same businesses that were involved in the alleged tax appraisal scheme involving Nicolo, Schwab and Finnman–Nicolo diverted gross receipts from those businesses to Roeder. Nicolo then allegedly falsely reported those payments as business expenses paid to Roeder for rent and for services that Roeder had purportedly rendered to Nicolo's businesses. Dkt. #70 at 161-62. The indictment further alleges that after receiving a fraudulently obtained fee from Kodak, Nicolo would receive bogus invoices from Roeder to make it appear that Nicolo's payments to Roeder were for legitimate services that she had performed for Nicolo's businesses. *Id.* at 163. The indictment lists thirty-seven separate deposits into Roeder's

---

[6](...continued)
Cir. Nov. 8, 2007), however, the Second Circuit left open the question of "whether Rule 8(a) or Rule 8(b) applies when a defendant in a multi-defendant, multi-count prosecution ... challenges the joinder of a count in which he is the only defendant charged." Accordingly, I will consider Roeder's motion with respect to Counts 67 through 71, which charge her with making and subscribing a false tax return, under both subsections (a) and (b).

bank accounts of checks received from Nicolo, totaling over $3.1 million.  *Id.* at 163-64.  The indictment alleges that by means of these and other acts, Nicolo and Roeder were able to avoid or substantially reduce Nicolo's tax liability.[7]  Thus, Count 57 charges a conspiracy to evade taxes on the proceeds of the kickback scheme charged in other counts of the indictment, and is properly joined with those counts.

The other tax charges against Roeder, Counts 67 through 71, which charge her with making and subscribing a false return in violation of 26 U.S.C. § 7206(1), are also directly related to the tax conspiracy count and to the fraud counts.  The tax conspiracy count, Count 57, alleges that as part of the tax conspiracy between Nicolo and Roeder, Roeder "deducted business expenses to which she was not entitled on her tax returns."  Dkt. #70 at 162.  That count further alleges that in an effort to reduce the tax liabilities of Nicolo and his companies, Nicolo and Roeder falsely reported on Roeder's federal tax returns that she had legitimately earned gross receipts from Nicolo's companies.  To then reduce the tax liabilities for those falsely reported gross receipt amounts, Roeder allegedly reported false business deductions on her tax returns.  The indictment alleges that Roeder did not actually operate a business, and that she was not entitled to those deductions.  *Id.* at 167.

Counts 67 through 71 specify the allegedly false deductions claimed by Roeder for tax years 2000 through 2004.  *Id.* at 173.  Those counts, then, are directly related to Count 57, which, as explained, was directly connected to the alleged property assessment kickback scheme.

---

[7]Those savings were apparently not offset by taxes paid by Roeder, in part because she claimed to be a resident of Florida, which, unlike New York, does not impose a state income tax. Dkt. #70 at 162.

Clearly, then, all the tax charges against Roeder "arose directly from the other offenses charged" in the indictment. *Turoff*, 853 F.2d at 1043.  The funds that were involved in the alleged tax conspiracy were derived from the property assessment scheme that forms the basis for the other charges against Nicolo and the other defendants.  Roeder is simply incorrect when she contends that the tax counts are unrelated to the other charges against her codefendants.[8]

Roeder next argues that even if the tax counts are properly joined with the other counts, severance of the tax counts against Roeder is warranted under Rule 14(a) of the Federal Rules of Criminal Procedure.  That rule provides that "[i]f the joinder of offenses or defendants in an indictment ... appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

"Even though distinct offenses have been properly joined under Rule 8, the court may order separate trials or grant a severance under Rule 14 if it appears that the defendant is prejudiced by the joinder." *United States v. Werner*, 620 F.2d 922, 928 (2[d] Cir. 1980).  Nevertheless, "[f]or reasons of economy, convenience and avoidance of delay, there is a preference in the federal system for providing defendants who are indicted together with joint trials." *United States v. Feyrer*, 333 F.3d 110, 114 (2[d] Cir. 2003).  Therefore, "[i]n order to prevail, the defendant must show not simply some prejudice but *substantial* prejudice." *Werner*, 620 F.2d at 928.  *See also Zafiro v. United States*, 506

---

[8]The case relied upon by Roeder, *United States v. Pendergrass*, No. 3:06-00147, 2007 WL 160956 (M.D.Tenn. Jan. 16, 2007), is distinguishable.  In *Pendergrass*, the court held that two tax counts were improperly joined with certain other counts, where there was no more than a "vague thematic connection" between the two sets of offenses.  2007 WL 160956, at *2.  In contrast, in the case at bar the connection between the tax counts and the fraud counts is clear: the tax conspiracy was a direct outgrowth of the alleged property appraisal scheme involving Nicolo and the other defendants and co-conspirators.

U.S. 534, 540 (1993) ("it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials"); *United States v. Amato*, 15 F.3d 230, 237 (2[d] Cir. 1994) ("Given the balance struck by Rule 8, which 'authorizes some prejudice' against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in 'substantial prejudice'").

In that regard, the Second Circuit has explained that

[w]hen defendants are properly joined under Rule 8, a severance, pursuant to Fed  R. Crim. P. 14, should only be granted if there is a serious risk that a joint trial would either compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.  A defendant seeking severance must show that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials ... .  Rule 14 does not require severance, even if prejudice is shown.  The rule leaves the type of relief granted to the sound discretion of the trial court.

*United States v. Walker*, 142 F.3d 103, 110 (2[d] Cir.), *cert. denied*, 525 U.S. 896 (1998) (internal citations omitted).

Roeder has fallen far short of making such a showing.  Her arguments largely center on "spillover" prejudice and jury confusion that she contends would be likely if all the defendants and charges are tried together.  A defendant raising a claim of prejudicial spillover, however, "bears an extremely heavy burden" of showing that the jury would be prevented from making a reliable judgment.  *United States v. Friedman*, 854 F.2d 535, 563 (2[d] Cir. 1988), *cert. denied*, 490 U.S. 1004 (1989); *accord United States v. Mullen*, 243 F.R.D. 54, 74 (W.D.N.Y. 2006).  Roeder has not done so.

To a great extent, Roeder's arguments in this regard are based on her contention that there is a "vast difference" between the allegations of the counts charging her codefendants with fraud and

the "unrelated" tax charges against Roeder. Roeder's Mem. of Law (Dkt. #113-6) at 6. As explained above, that is simply incorrect. In fact, the tax charges are directly connected to the charges concerning the alleged kickback scheme.

In addition, even if the tax charges against Roeder were tried separately, at least some of the evidence relating to the alleged kickback scheme involving Nicolo and the other defendants would likely be admissible at Roeder's trial, to show the source of the funds that she received from Nicolo and her motive to falsify her tax returns. *See United States v. Spinelli*, 352 F.3d 48, 55-56 (2[d] Cir. 2003) (noting that "much of the evidence about [codefendant's] crimes would have been admissible at a separate trial of Spinelli, since it was relevant to proving the nature and scope of the conspiracy in which both were, to differing degrees, involved," and adding that "[m]oreover, even 'the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance'") (quoting *United States v. Carson*, 702 F.2d 351, 367 (1983)); *United States v. Clark*, 928 F.2d 639, 644 (4th Cir. 1991) ("Even if the motion for a severance had been granted, evidence about the drug transactions would have been admissible in the tax case to prove income and show its probable source"); *United States v. Sigalow*, 624 F.Supp. 499, 501 (S.D.N.Y. 1986) (evidence regarding alleged prostitution enterprises "would certainly be admissible at a separate trial on the tax conspiracy charge," since "[t]hese alleged enterprises constitute the source of the unreported funds alleged in the conspiracy count").

Finally, the fact that Roeder is not charged in the counts charging her codefendants' participation in the appraisal scheme does not in itself warrant a severance. "Even 'joint trials involving defendants who are only marginally involved alongside those heavily involved are

constitutionally permissible.'" *Spinelli*, 352 F.3d at 55 (quoting *United States v. Locascio*, 6 F.3d 924, 947 (2ᵈ Cir. 1993), *cert. denied*, 511 U.S. 1070 (1994)).  While Roeder's role may be relatively minor compared to Nicolo and the other defendants, any undue prejudice to her can be avoided through appropriate jury instructions.  *See Zafiro*, 506 U.S. at 540-41 (trial court's instructions to jury to "give separate consideration to each individual defendant and to each separate charge against him" cured any risk of prejudice from joint trial); *Feyrer*, 333 F.3d at 114 (even where risk of prejudice is high, "less drastic measures–such as limiting instructions–often suffice as an alternative to granting a Rule 14  severance motion"); *Spinelli*, 352 F.3d at 55 (stating that this was not a case "in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice ... especially ... since the district court explicitly instructed the jury to consider the defendants individually"); *United States v. Miller*, 116 F.3d 641, 679 (2ᵈ Cir. 1997) (noting that spillover prejudice may be remedied through clear judicial instructions), *cert. denied*, 524 U.S. 905 (1998).

**B. Schwab and Finnman**

Defendants Schwab and Finnman have also moved for a severance.  Schwab seeks to have his case severed from Nicolo, and Finnman seeks a severance from both Schwab and Nicolo.

These motions present even less of a basis for severance than Roeder's.  Schwab, Finnman and Nicolo are all charged with participating in the same scheme to defraud.  That each defendant's alleged role may differ from the others' is not enough to warrant a severance.  As noted, the Second

Circuit has held that it is permissible to try "defendants who are only marginally involved alongside those heavily involved ... ." *Spinelli*, 352 F.3d at 55. *See also United States v. Cardascia*, 951 F.2d 474, 483 (2$^d$ Cir. 1991) ("a disproportionate introduction of evidence relating to joined defendants does not require a severance in every case"); *United States v. Chang An-Lo*, 851 F.2d 547, 557 (2$^d$ Cir. 1988) ("it is well established that 'differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials'") (quoting *United States v. Carson*, 702 F.2d 351, 366-67 (2$^d$ Cir. 1983)).

Defendants' contentions that a severance is justified based on their mutually antagonistic defenses are also meritless. Defenses are mutually antagonistic when accepting one defense requires that "the jury must of necessity convict a second defendant." *Cardascia*, 951 F.2d at 484. Defendants have not shown that to be the case here.

Furthermore, "[m]utually antagonistic defenses are not prejudicial *per se*." *Zafiro*, 506 U.S. at 538; *accord United States v. Blount*, 291 F.3d 201, 209 (2$^d$ Cir. 2002). In general, severance on this ground is justified "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt." *Zafiro*, 506 U.S. at 539. Again, defendants have not demonstrated the existence of such a risk. To the extent that defendants may try to shift culpability to each other, any undue prejudice can be avoided through proper instructions to the jury. *See Salameh*, 152 F.3d at 116-17.

### V. Roeder's Motion to Change Venue

In addition to severance, Roeder also seeks a change of venue of the charges against her from the Western District of New York to the Southern District of Florida.  Roeder concedes that, with respect to the tax conspiracy count, Count 57, venue in this district is proper, because the indictment alleges that acts in furtherance of the conspiracy occurred in this district and that Roeder's tax preparer signed the tax returns in this district.  She contends, however, that this charge against her should nevertheless be severed from the rest of the indictment and transferred to Florida pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure, which permits transfers of venue "for the convenience of the parties and witnesses and in the interest of justice."

With respect to the substantive charges of making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1) (Counts 67-71), Roeder contends that although the indictment describes her as "a resident of the Western District of New York," Dkt. #70 at 172, during the time of the alleged offenses she was in fact a resident of Florida, and only maintained a "seasonal house" in New York.  Dkt. #113-6 at 19.  Roeder contends that venue in this district is therefore improper.  She asserts that venue for a violation of § 7206(1) "lies either in the district where defendant is living or at the collection point where income tax returns should have been filed."  Dkt. #113-6 at 18.  Roeder contends that throughout the time period of the offenses charged in the indictment, she was a resident of Florida, that her tax returns were filed with her Florida address, and that they were sent to an Internal Revenue Service collection point in Atlanta, Georgia.

Roeder's arguments are not persuasive.  With respect to her Rule 21(b) motion, Roeder has the burden of justifying a transfer.  *United States v. Stein*, 429 F.Supp.2d 633, 645 (S.D.N.Y. 2006).

In deciding a motion, the court should consider the location of:  the defendants; possible witnesses; the events likely to be at issue; relevant documents and records; and defense counsel.  *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2ᵈ Cir. 1990) (citing *Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 243-44 (1964)), *cert. denied*, 501 U.S. 1211 (1991).  The court may also consider: the potential for disruption of the defendant's businesses if transfer is denied; expenses to be incurred by the parties if transfer is denied; the relative accessibility of the place of trial; the docket conditions of each potential district; and "any other special circumstance that might bear on the desirability of transfer."  *Id.*  "No one of these considerations is dispositive, and it remains for the court to try to strike a balance and determine which factors are of greatest importance."  *Id.*

These factors do not support a change of venue in this case.  As stated, a severance of the tax charges against Roeder is not warranted, and there is certainly no basis to transfer this entire case to Florida.  Even considering only the tax charges against Roeder, however, she has not shown that a transfer is warranted.  The fact that some of the relevant witnesses or documents may be located in Florida, or that some of the relevant events may have occurred there, is not enough to justify a transfer.  That is particularly so given the nature of the charges against Roeder, which to a great extent will likely involve documentary evidence, which could be sent to or produced with relative ease in either New York or Florida.[9]  In addition, despite Roeder's contention that she is a Florida resident, it does not appear to be disputed that she and Nicolo continue to own residential property

_____

[9]I also note that according to the indictment, defendants' tax preparer for the years in question was David L. Snyderwine, an accountant in Bath, New York.  Dkt. #70 at 161.  The government contends that Snyderwine continues to reside in this district.  Dkt. #116 at 17.

in this district.  A trial here would not require Roeder to travel to some remote location with which she has no connection at all.

In addition, venue in this district is proper as to Counts 67 through 71, regardless of whether Roeder is a resident of Florida or New York.  For one thing, the indictment *alleges* that Roeder is a resident of the Western District of New York, and that she committed the offenses charged in those counts in this district.  Dkt. #70 at 172.  As stated, where the indictment on its face sufficiently alleges venue, a pretrial claim of improper venue is generally premature.  *Ayeki*, 289 F.Supp.2d at 188.

Furthermore, in *United States v. Rooney*, 866 F.2d 28 (2$^d$ Cir. 1989), the Court of Appeals for the Second Circuit held that "in a prosecution under section 7206(1) '[v]enue may lie not only where the return was made and subscribed, but also where filed, or where the preparer received information from the defendant even though the defendant signed and filed the returns elsewhere.'" *Id.* at 31 (quoting *United States v. Marrinson*, 832 F.2d 1465, 1475 (7th Cir. 1987)).  In addition, the court noted that "the continuing offense statute applies to section 7206(1) prosecutions, so that venue lies in the district in which a return was prepared and signed even if it was filed and received elsewhere."  *Id. See also United States v. Pace*, 314 F.3d 344, 352 (9th Cir. 2002) ("The act of making a tax return commences when one prepares and furnishes information material to the return and continues until that information is received by the IRS.  For such continuing offenses, venue is proper in any district in which the continuing conduct has occurred").  Roeder does not appear to dispute the government's contention that her tax preparer was located in this district when the alleged offenses occurred, which makes venue here proper.  *Cf. Pace*, 314 F.3d at 352 ("As Pace

furnished information essential to the completion of the tax return in Arizona, the § 7206(1) offense was properly tried there").

## VI. Roeder's Motion to Dismiss Count 57

Roeder also moves to dismiss Count 57, which charges her and Nicolo with conspiring to defraud the Internal Revenue Service in violation of 18 U.S.C. § 371.[10]  To properly allege such a conspiracy (which is often referred to as a "*Klein* conspiracy," *see United States v. Klein*, 257 F.2d 908 (2d Cir. 1957)), Count 57 must allege:  (1) an agreement to accomplish an illegal or unlawful objective against the United States; (2) commission of an overt act by the conspirators in furtherance of conspiracy; and (3) defendant's intent to agree to the conspiracy and to defraud the United States. *See United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998); *United States v. Furkin*, 119 F.3d 1276, 1278 (7th Cir. 1997); *United States v. Tedder*, 801 F.2d 1437, 1446 (4th Cir. 1986).

Roeder contends that the indictment fails to allege a *Klein* conspiracy because it does not allege an agreement between her and Nicolo to commit any unlawful act.  To the contrary, Count 57 expressly alleges that Roeder and Nicolo "did ... knowingly and willfully conspire and agree to defraud the United States ... in the ... collection of .. income taxes." Dkt. #70 at 159.  That allegation is followed by twenty paragraphs detailing the nature of the conspiracy and the manner in which it was carried out.  *Id.* at 159-67.  That is more than sufficient to allege a violation of § 371.  *See United States v. Ervasti*, 201 F.3d 1029, 1037-38 (8th Cir. 2000) (upholding as sufficient *Klein* conspiracy indictment where government alleged that defendants "did unlawfully, willfully and

---

[10]Nicolo has joined in this portion of Roeder's pretrial motions.  *See* Dkt. #112.

knowingly combine, conspire, confederate and agree ... to impede and impair the due administration of the Internal Revenue Code of the United States in the ascertainment, computation, assessment and collection of taxes"); *United States v. Gambone*, 125 F.Supp.2d 128, 132 (E.D.Pa. 2000) (government properly alleged a *Klein* conspiracy, since indictment alleged that there was an agreement to achieve an unlawful objective, specifically, to defraud the United States government, a series of overt acts performed by defendants in furtherance of the conspiracy, and intent by defendants to agree to the conspiracy and to defraud the United States); *see also United States v. Helmsley*, 941 F.2d 71, 90 (2[d] Cir. 1991) ("Although the *Klein* language may have become customary boilerplate in defraud clause indictments, it is not legally required.  What is required is only that an indictment charging a defraud clause conspiracy set forth with precision 'the essential nature of the alleged fraud'") (quoting *United States v. Rosenblatt*, 554 F.2d 36, 42 (2[d] Cir. 1977)), *cert. denied*, 502 U.S. 1091 (1992).


## CONCLUSION


Defendant John Nicolo's motion (Dkt. #74-1) to transfer venue, to dismiss the honest services fraud counts and for a bill of particulars is denied.  Nicolo's motion (Dkt. #112) for dismissal of Count 57 and for a severance of all tax charges is also denied.

Defendant Charles Schwab's motion (Dkt. #122) to dismiss the honest services fraud counts and for a severance is denied.

Defendant David Finnman's motion (Dkt. #76) to dismiss Count 1, for a severance and for a bill of particulars is denied.

Defendant Constance Roeder's motion (Dkt. #105) for a change of venue, and her motion (Dkt. #113) for a severance, for dismissal of Count 57, for a transfer to another district, and for a bill of particulars are denied.[11]

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       November 27, 2007.

---

[11]Defendants also filed omnibus motions relating to discovery about various matters.  The Government responded and appears to have agreed to provide much of what was sought.  Furthermore, as noted above, there has been substantial production of documents by the Government.  In light of this, it appears that most of defendants' other requests for relief have been resolved or are now moot.

If this is not so, defendants must apprise the Court with specificity as to what remains at issue.  This should be submitted within fourteen (14) days of entry of this Decision and Order.